BREAUX, C. J.
An indictment, charging him with murder for having taken the life of Jos. L. Young, was found against the defendant and returned in court on the 9th day of December, 1912, by the grand jury of the parish of East Baton Rouge.
The jury not having agreed to a verdict in the first trial, the court had a mistrial entered. At the second trial defendant was found guilty of manslaughter and recommended to the extreme mercy of the court. He was sentenced to serve ten years in the penitentiary.
The defendant and the deceased were on friendly terms on the day of the homicide. The families of each of these young men were well known. The father of the defendant had been a well-known member of Congress; also his grandfather. The father of the deceased was sheriff of the parish of East Baton Rouge. The father of the defendant at the date of the tragedy was the superintendent of the State Institute for Deaf and Dumb. He testified on the first trial, and his evidence was read to the jury at the second trial. He departed this life between the date of the first and the second trials.
The deceased and the defendant were much together on the day preceding the night of the killing and indulged freely in intoxicants. The defendant was more under its influence than the deceased. At one of the bars of one of the saloons where they drank during the day, defendant offered to divide all that he had with his companion, the deceased.' On their way to the institute, to which the deceased was taking the defendant (he needed a .helping hand on account of his inebriated condition, which was freely extended to him by the late J. L. Young), they trudged along arm in arm until they arrived at the foot of the steps leading to the third floor of the building, where the defendant and his wife had their room and where the tragedy occurred. 'They stepped up the stairs together without the least manifestation of unfriendly feeling. They spoke to each other in a good humored way and even joked the one with the other.
Defendant’s father and mother occupied rooms on the second floor of the institute; also an adopted daughter and the little daughter of the defendant.
After the deceased and the defendant entered defendant’s room on the third floor, all was quiet for a short time. At about 10 o’clock p. m., the mother of the defendant testified that she heard a heavy thud as of some one jumping out of bed, and immediately afterward a shot, and then a scream. She said that she heard a sharp click sound of contact between the heels of her daughter-in-law’s shoes and the floor (a sound she had often heard). That it was possible for one *815 to hear the walking of persons on the floor above. The father of the defendant from his bed of illness inquired of the mother if it was a pistol shot he had heard, and she answered, “Yes,” and started for the room of her son. A little prior to this time, ■ the father asked the mother if the son had been drinking, and she replied that he had been drinking. She testified that on her way to the room she met her daughter-in-law, who exclaimed, “Oh! Oh! something terrible has happened.” On entering the room, she saw her son standing erect in a dazed condition, in a trance or state of somnambulism. She shook him and waked him up and said, “Ed., you have killed your father.” “Is he dead?” was the only reply that he made. The deceased, who had just been shot, was on the floor. She immediately went over to the phone and called physicians and notified members of the family of the deceased. The latter’s wife came within a few minutes with his father. She further stated that she found a pistol on the floor; that ordinarily the pistol was kept on the table or on the mantel. Neither the deceased nor 'the defendant had arms on their persons. The accused was a fertilizing inspector. On his trips away from home he would take the pistol and on his return he would take it from his grip and put it down anywhere. The defendant and the deceased were employes in the same department of the government.
[1] The first objection of defendant before us for decision relates to the position of the district attorney in the alleged attempt to impeach the testimony of the mother of the defendant.
It will be remembered that the mother of the defendant testified in chief for the defendant on the first trial. It does not appear by the stenographer’s notes of her testimony on the first trial that she testified that her son said, in answer to the inquiry of the wife of the deceased, “Yes, it was an accident.”
On the second trial she was called as a witness by the state and not by the defendant. No question was asked her by the state touching the statement of the son just before mentioned, but on cross-examination, in answer to question propounded by counsel, she stated in substance that her son said that the killing was the result of an accident, in answer of the inquiry of the wife of the deceased a few minutes after the homicide. On redirect examination of the mother of the defendant, the district attorney asked her whether she had testified on the first trial, and, when he was about to read a portion of her testimony to remind her of that to which she had testified on the first trial, the counsel for the defendant objected on the ground that it was an attempt by the state to impeach the witness, who was, as before stated, a witness for the state.
We will not quote in full the testimony of the mother of the defendant. We have before us an appreciation of her testimony by the trial judge, which makes it evident, if that appreciation be true (and we have no reason to believe that it is not), there was no ground for impeaching her testimony on this particular point. She is corroborated by statement of the highest order: That of the trial judge, who said that on the first trial her testimony, to quote literally, “was identical with the testimony that she gave to-day regarding her son’s reply to the question of the wife of the deceased.” The learned judge adds, as to her testimony on other matters, especially with reference to the noises above (that is, the creaking of the heels of shoes against the floor above), “I do not recall whether they were testified to on the other trial, but she has explained that the record in the other trial contains omissions and inaccuracies and incorrect statements,” which is possible, but the trial judge *817 was positive that the witness in the first trial had testified, “Yes, it was an accident.”
Addressing the district attorney, the trial judge added further:
“It was on that theory you had a right to call a witness to testify to other facts. The court overruled the objection and ruled that you could do so rather than on the question of impeachment.”
That is, he could inquire regarding facts and if necessary contradict the witness by showing error of statement but did not have that right upon the question of attempted impeachment.
Counsel for défendant, Mr. Beale, then said, “The court does not rule, then, that it can be used for the purpose of impeaching the testimony,” to which the judge replied, “I think he has the right to introduce the witness for the purpose stated.”
To this ruling, counsel for defendant reserved a bill of exceptions.
The asserted contradiction consists in the following: The wife of the deceased testified, after the mother of defendant had testified in regard to the answer of the son (this, as before stated, was a contradiction of the mother), “No, sir; I did not hear him say it was an accident.”
[2] But, as the judge recollected distinctly that she (the mother of the defendant) had testified on the first trial as on the second in regard to the answer of the accused to the wife of the deceased, “Yes, it was an accident,” we do not find that there was the least cause for impeaching the witness. It did not give ground for impeachment of the whole testimony. It is not an instance of falsus in uno, falsus in omnibus, under the circumstances.
The statement and ruling above noted were noted in course of the proceedings during the examination of the witness. Subsequently the trial judge gave additional reasons. They were that the district attorney had objected to counsel for the defendant examining the witness regarding other facts than those testified to in chief. That, wishing to be on the safe side, he (the court) overruled the objection but at the same time reserved to the state the right to examine the witness regarding the alleged new facts testified to on the second trial.
It was on the re-examination by the district attorney that he urged that new evidence had been introduced on cross-examination over his objection and that the testimony varied, as he said, from the testimony given by the witness on the former trial.
The court permitted the district attorney to examine the witness in regard to the alleged new facts. The court held that, irrespective of any right the state might have had to impeach the testimony of a witness (on the ground of surprise), the district attorney could re-examine on new facts brought out on cross-examination and call a witness to testify to a state of facts different from those given by another witness for the state or even by the same witness at a former trial. To quote literally:
“It was mainly upon this theory that the questions were permitted and the objections overruled.”
The court adds as part of its per curiam:
“It may be noted that a large part of this bill is merely an argument by counsel for defendant relating to facts, of which the jury are the sole judges.
There is precedent for the ruling which permits a witness to be interrogated upon redirect examination, where upon cross-examination of a state witness the defense elicits other facts than those before testified to, which are prejudicial to the prosecution. State v. Williams, 111 La. ISO, 35 South. 505.
The statement of the trial court is positive and direct upon the point. There were new facts elicited, and they were admitted with the right reserved, as before stated.
. The decision cited, supra, is quite control *819 ling, particularly in view of the ruling and the reservation made.
The court could not do less under the circumstances than allow the examination strictly as to the new facts.
To this point, accepting the statement of the district judge, there was no permission granted to impeach any one, but the ruling restricted the examination to questions to ascertain whether or not the witness was not in error. The one calling a witness is not absolutely bound, by all his statements. State v. Boice, 114 La. 855, 38 South. 584; State v. Vickers, 47 La. Ann. 1574, 18 South. 639; State v. Simon, 37 La. Ann. 569.
There was doubtless an attempt made by the district attorney, while witnesses were examined, to impeach the testimony of the witness (mother of the defendant), but that attempt did not meet with the sanction of the district judge, according to the statements to which we have referred. ■
Learned counsel for defendant with confidence quote from the case of State v. Vickers, 47 La. Ann. 1574, 18 South. 639. The present ease is easily distinguished from the cited case. In the latter the trial judge permitted the answer for the one purpose of discrediting. In the former, not only this was not permitted, but, as noted above, the trial judge expressly stated that the testimony was true in one respect and in other respects it was entirely probable that it was entirely correct.
The interposition and instructions of the trial judge dominate and overcome attempts at impeaching a witness where the purpose is to impeach and there is no ground to impeach, although there may be good reason to obtain further statements and explanations from a witness. State v. Easley, 118 La. 690, 43 South. 279; State v. Heidelberg, 120 La. 301, 45 South. 256.
As to the other testimony of this witness about the resounding heel of slippers on the floor overhead and other testimony similar, there was no direct attempt to contradict the witness.
The objection was that the witness had not made the statement about these while testifying on the former trial. The judge did not recall what was said at the former trial except to the extent before noted, but in effect accepted the testimony of the witness stating that she has stated, as to the clicking heels and other noise on the third floor, that the record of the first trial was not accurate, “which is possible.”
This certainly does not have the appearance of permitting the impeachment, of the witness, up to the time, at any rate, that the court permitted the state to offer evidence to prove that there was a difference between part of the evidence, that on the first trial and that on the second.
This presents a question which will be considered of itself later; that is, whether the effect of the attempt at impeaching the testimony was prejudicial.
The position of defendant is that the district attorney did not observe the restrictions placed on the evidence but continued in the attempt to impeach the testimony of the mother of the defendant. We will take up this last question later. We deem it advisable to separate some of the issues in deciding the question of asserted attempt at impeaching the witness and its effect upon the case.
1. The next point arose because of the alleged erroneous statements of the district attorney in his closing address, in which he took occasion to say that the mother of the defendant admitted that she did not know whether the wife of defendant was upstairs or not, and that she charged the variance in her testimony to oversight or want of skill of the stenographer. Copy of the testimony of the mother of defendant in answer to the district attorney is copied in the record; also copy of the argument of that officer.
*821 The charge of the defense is that the officer did not correctly quote the testimony and that his comments on her testimony were inaccurate.
The trial judge states that counsel’s objection to the utterances of the district attorr ney was not tenable. That he heard the testimony and did not consider that he had gone out' of the record or had misquoted the substance of the testimony.
The trial judge’s statement is that counsel did not go out of the record. To this statement there must be due weight given under the prevailing practice.
[3] From the foregoing we infer that the alleged misstatements of the prosecuting officer did not have the prejudicial effect for which the defendant contends.
In order that the point' be considered well taken, it must appear that there was some degree of recklessness in making unfounded assertions of facts and the utterances prejudiced the cause.
We have found neither the one nor the other in this ease. The authorities are not with the defendant on this point, as will be evident upon consulting State v. Smith, 124 La. 1041, 50 South. 842; State v. Young, 114 La. 686, 38 South. 517.
[4] 2. The next complaint on which the defense presented its ground is that' the district attorney in his argument before the jury referred to the accused as not having taken the stand as a witness.
The following were the words of the district attorney to the jury;
“When that noble and true little woman, the widow of Joe Young, gentlemen of the jury, on account of Ed. Robertson, when that poor little woman asked him, ‘It must have been an accident?’ was there any answer? No answer then and no answer to you, gentlemen of the jury, even yet.”
The trial judge informs us that the statement of the district attorney as above is incomplete and misleading. That the district attorney used the language as quoted but also said, “No answer have you heard, gentlemen, from a single witness sworn in this case.” That the district attorney completed the sentence as here stated while counsel was making his objection to the court, and, after the objection was noted, the district attorney again repeated the words above quoted. That the stenographer’s report contains dashes to denote that the district attorney completed the sentence while the objection of counsel was being taken. That an excerpt attached shows that no instruction was asked for, and, as the rule which counsel invoked was not violated by the district attorney, the duty of the court in the premises was performed.
The trial judge stated that a request had been made by one of the counsel for the defendant directing his attention to the utterances of the district attorney in arguing before that body. Counsel goes on to state that several requests were made of him during the argument to instruct the jury and that he declined to give specific instructions; that he confined himself to a general instruction to the jury to disregard anything said or statements made by counsel for either side that was not borne out by the testimony for the reason that the authorities hold that, where counsel in argument disagree, a specific instruction by the court might lead the jury to assume that the court agreed with the one or the other of the counsel and thereby make the court communicate to the jury its view of the facts.
The variance, not very considerable, between the ruling of the judge and his statement afterward as a judge was not so grave in character as to neutralize the effect of the ruling. The district attorney corrected his statement by completing the paragraph. He did not charge that the accused had failed to take the stand as a witness. Unless such an assertion is directly made or the inference is plain that he intended to bring to *823 the attention of the jury the fact that the defendant had not testified, there is no ground for maintaining the objection.
Here again prejudice to defendant’s cause is anything but evident, for it is not by any means certain that the utterance can be taken as an intimation even that the accused had not testified. The words spoken might be addressed to any jury without awakening the thought that the defendant had not testified or that if he had testified he had\ failed to satisfactorily answer to the jury, to quote the district attorney.
[5, 6] 3. The next objection is that defendant’s counsel was not permitted to propound questions to the mother of defendant to elicit facts which were a part of the res gestae, and not permitted to propound questions to test the recollection of the witness on cross-examination.
The facts have already been in a great part stated, to wit: That she heard some one and her son stumbling up the steps “laughing and mumbling.” That she, upon hearing a shot, went to her son’s room and the room of her daughter-in-law. That she there found the deceased lying on the floor and her son in his nightshirt in a dazed and unconscious condition. All of this had been admitted on cross-examination by defendant’s mother, who said that on her way to the room she met her daughter-in-law, who was running downstairs and who said, as before stated, that something dreadful had happened.
To the admissibility of the foregoing, there was ground for objecting. The witness said that five minutes after the shot she inquired of her daughter-in-law as to what had happened. The trend of the examination was toward proving that the daughter-in-law was present when the fatal shot was fired and knew what had occurred. The district attorney objected on the ground that the - testimony was hearsay and was not a part of the res gestae, and it was an attempt to make the wife a witness in behalf of the husband.
The court did not directly pass upon the objection raised but excluded the testimony for the reason that the daughter-in-law was in court. The witness, being present, could best testify as to her knowledge. Her evidence was the best. There was no good reason for allowing what she had said to be proven by the testimony of her mother-in-law. We are not impressed with the view that the utterances of the daughter-in-law were a part of the res gestse except the exclamation she uttered when running down the stairs before she met her mother-in-law. We do not understand that this part of the evidence was excluded. The testimony shows that the mother of defendant said to her daughter-in-law after she had sent a telephone message for physicians, “Sally, tell me something of this.” In answer the daughter-in-law stated all she knew about the case. It was a narrative statement and not one given impulsively, such as required in order that evidence may be considered part of the res gestse. The ruling of the trial judge on the objection of the district attorney was not directed against the admission of testimony offered to prove that the wife of the deceased was present in the room in which the homicide occurred. It was directed against any statement of the wife of the defendant relating to incidents of the homicide, which defendant contended was part of the res gestse, and for that reason we think it was correct.
[7] 4. Another ground of defense is that under the Constitution, art. 9, part of the Bill of Rights, the wife can testify, because, as defendant contends, the accused has the right to have a compulsory process to procure the presence of witnesses and' the benefit of their testimony. This refers to witnesses who are qualified to testify under the law.
*825 We will state at this time that we are informed that the wife of defendant was called as a witness and that she was not permitted to testify. No exception was taken to the refusal to allow her to testify for any purpose, even to prove the alleged res gestee.
With reference to res gestee, learned counsel for defendant cites Wharton on Evidence, 263, to the effect that, when a wife’s declaration forms part of the res gestee, it is admissible against the husband.
In order that such evidence may be admissible, it must first be shown that it is a part of the res gestee, which the defendant has not succeeded in doing.
[8] 5. A contention arose in court among the relatives of the deceased and those of the defendant. The latter charged that three of the former had pronounced something untrue, uttered toy one of the witnesses, and that the father of the accused had shaken his head in a manner to disapprove something that was said by witnesses.
This was heard by bystanders who were further away from the jury than were those who improperly acted, it was stated, and signified some disapproval while witnesses were testifying. One of the attorneys for the accused protested and characterized it as an interference with the proceedings.
The jury, at the time the discussion arose in regard to this complaint, retired. There was an explanation made, and the court gave orders to put an end to the alleged interferences. Evidence was taken to prove what had occurred. The court held, after having heard the explanation and the testimony upon the subject, that the evidence was that the jurors had not noticed the interference and knew nothing about it. The court did not seem to attach great importance to what had taken place.
While we think that it was unfortunate, we can think of no good reason why the verdict should be annulled when each member of the jury swore that he had not noticed the impropriety of conduct charged by defendant’s counsel. The court concluded its statement upon the subject in the following words:
“I am sure that the alleged occurrence had no effect on the verdict of the jury.”
[9] 6. In the next place the testimony of the mother of defendant is again referred to by defendant’s counsel as sustaining the theory that the killing was an accident. This reference to the testimony of the mother was followed by a request by counsel for the defendant of the court to charge the jury, if they believed beyond a reasonable doubt that defendant shot and killed the deceased but that the shooting was accidental, or if they entertained a reasonable doubt thereof, the defendant would be entitled to an acquittal. Upon the court’s refusal to charge as requested, the defendant urged that there was error as the requested charge was not covered by the general charge and that defendant was entitled to the instructions requested. The court in answer held that he had given all needful instruction, and in the second place held properly that the special charge requested was objectionable because it excluded the idea that a homicide may possibly be unintentional and yet a felony.
7. The trial judge gave as reason for declining to give the special charge requested that the special charge did not include the crime of involuntary manslaughter. The answer of counsel for defendant is that there was no necessity of including involuntary manslaughter because it is not one of the issues of the case before the court. That there was no question of involuntary manslaughter in the case. That a court cannot be called upon to include in a requested charge a crime not at all at issue, a crime which is not at all embraced under the terms of the indictment. That is quite true, but it *827 is also true that it is not the only ground upon which the trial judge refused to give the requested charge. We therefore have to consider this other ground, which was that the court had fully instructed the jurj^ in the general charge to the jury. In his general charge the court defined homicide as the unintentional taking of life by misadventure or intentionally in self-defense. 1-Ie also referred at some length to the accidental taking of life by a person of unsound mind, incapable of forming a guilty intent, and referred to the principles of self-defense, defined malice, intent. Insanity also was dwelt upon in the charge—moral and emotional; delusion, insomnia, and somnambulation; inebriation. Pie cited a number of decisions and quoted from their text. The nature of reasonable doubt was explained and the light in which it was to be considered ; accidental killing and unintentional homicide. The general instructions were sufficiently full to cover fully the crime charged and those for which it was found possible to find the defendant guilty if the evidence justified it or not guilty if not sustained by the evidence.
[10] 8. Another point before us for decision ; The mother of defendant was requested by defendant’s counsel to state to the jury what was the appearance of defendant’s face at the time she saw him just after the killing and whether or not she had 'before seen him in that condition and inform the jury under what circumstances she had previously seen him; She answered that she had seen him come down the stairs apparently asleep and pick up things and drop them. He would move around the table and do other acts. That he was not drinking. Lastly she was asked whether or not in her opinion he had possession of his senses to any extent that night.
The district attorney objected.
The court sustained the objection on the ground that the witness, was asked whether or not in her opinion the accused was in the possession of his senses to any extent on the night of the homicide. That the witness was not an expert. None the less that he had allowed the witness to tell “what were the actions of the accused as well as everything done or said by him, leaving to the jury to draw their own conclusions.” The court added that at a later stage of the trial all of the evidence offered (including the opinion above excluded) as to the ability of the accused to “understand” went to the jury without objection.
[11] 9. Another ground of the defense was that the court refused to instruct the jury as to somnambulism. The court did charge on the subject of somnambulism and explained to the jury the possible effect of somnambulism; said to them that the writings of alienists gave accounts of many cases in which acts of atrocities had been committed. That in a case recently in Kentucky somnambulism was the ground of defense on the theory that the one killing was incapable of criminal intent.
Taking the charge as a whole and considering the points discussed, we think it sufficiently broad to cover the case. We find it impossible to sustain the defense on this point.
[12] 10. Another special charge which the court refused to give was equally without merit. It related to the defendant’s character for peace and quietude. This point of defendant was without merit because there was only a very slight difference between the words used by the court, both in giving the special charge upon the subject at the time that counsel requested a special charge and in the general charge. The instructions given by the judge were as full as those requested by the defendant.
[13] 11. At another time counsel for defendant asked for special instructions in a *829 [13] 11. At another time counsel for defendant asked for special instructions in a The probability of defendant’s innocence is a just foundation of reasonable doubt of his guilt and therefore for his acquittal.
The court declined to give this charge which is sustained by the fact that the law of reasonable doubt was fully explained. The court added that the special charge is misleading, if not erroneous. A reasonable doubt was considered, as before stated, and explained by him to the jury.
Defendant has no cause of complaint on this ground.
[14] 12. Another ground of defense is that the opening remarks of the district attorney were prejudicial to the defense to an extent that it gives ground to set . aside the sentence. The officer sought to be rhetorical and drew, from his reading, illustrations. They might have been left out. The district judge thought that they were not prejudicial remarks and, as we understand, looked upon them as harmless. The ground of the defense is that they were an appeal to the jury, to their passions and prejudices. We really do not think that they had the effect urged. The district judge at some pains stated that, when during his address the district attorney spoke of the wife, father, and sisters of the deceased, no objection was raised. That the objection to the district attorney’s remarks about the wife, father, and sisters were made some time afterward and too late to be considered timely. He mentioned the time the remarks were made in the course of the argument and states that it was at that particular time. That the remarks were warranted by the testimony and the facts were all well known to all who were connected with or attended the trial.
[15] The statement of the trial judge, uncontradicted by the record, must have weight. He stated that the objection was not interposed when the remarks were made but some time afterward. The objection in view of this statement will not be sustained, for, if sustained, it would not be in accordance with the jurisprudence of this court. Of this it' is very certain that no request was made at any time of the judge to instruct the jury upon the subject. The intentional or unintentional remarks of the prosecuting officer regarding sisters of the deceased, who had or had not testified, and alluding to other members of the family, are not irregularities to vitiate a verdict. Were that to be the case, legal proceedings would become exceedingly uncertain.
[16] 13. The next point relates to special instructions. The district attorney requested the court to charge specially as follows:
“I know that it is hard for you in the very presence of the mother of the accused and his wife and his loved ones to say by your verdict that he is guilty of this offense. It is upon just such occasions as these that true manhood is required and the courage of one’s convictions is required.”
The objection of defendant was that this was an appeal to the passions and prejudices of the jury against him. The court said that these remarks were considered in another per curiam and that there was no good ground to object.
Unquestionably the duty imposed upon the jury was anything but pleasant and to that extent the remarks of the district attorney were true. As to manhood and courage, referred to by him in the sentence following, it was not objectionable as it can have no effect among men of average intelligence. This the jury is presumed to have. The defense generally has full latitude in arguing the ease. The district attorney should not be too closely held down.
[17] 14. The next ground of defense was that the district attorney misquoted the testimony in his opening address. That he said that Mr. Bani was a witness for the defendant although he was a witness for the state. *831 That he refused to recall and correct that utterance and the judge did not admonish the jury to disregard the statement.
If there was anything at. all in the objection, it was the easiest matter for the parties themselves (counsel for defendant) to correct it, if they attached any importance to the correction. The court, however, states that it is true that the witness was called to the stand by the state, but it was equally true, as made to appear by the evidence, that the witness was the night watchman of the Institute for the Deaf and Dumb, in which institution the accused resided and of which the father of the accused was superintendent at the time of the homicide, and that Bani had been summoned by the defendant; that he had testified as defendant’s witness at the former trial.
The bare fact that a witness is referred to as of the defense does not add materially to the evidence. It is what may be termed, to borrow a phrase, a “brutum factum.” It should not have the least effect one way or the other.
[18] 15. We pass to the next ground of the defense. It appears that counsel objected to the following:
“I cannot conceive and I do not believe that this jury will be able to conceive how you can possibly escape from one of two conclusions [we quote literally] that if it was not murder with malice aforethought then it was the crime of manslaughter. Certainly Joe Young is dead; certainly Ed. Robertson killed him.”
The court instructed the jury that they should disregard any statement made by counsel that is not borne out by the evidence and more to the same effect. He also said to the jury that they are the judges of the facts. The court held that the utterances were within the bounds of legitimate argument.
We have not found wherein there was reversible error.
Defendant’s counsel cite with confidence the decision in State v. Accardo, 129 La. 666, 56 South. 631. In that case the prosecuting officer strongly arraigned the defendant as guilty of murder. He had gone as far as it was possible to go in his attempt to convince the jury of defendant’s guilt. He said to them that he had made an examination into the evidence and that he had become convinced of the guilt of the accused; that he was not obliged to prosecute and he would not be engaged in prosecuting in this instance if it were not that the defendant was guilty.
The court held that the remarks were highly improper. The court evidently thought that there was too much of the personal in the attitude of the district attorney and that he had gone beyond all reasonable bounds in his anxiety to obtain a conviction. This was a very extreme ease. In its important features it is not analogous to the present case for decision.
In another case cited, to wit, State v. Mack, 45 La. Ann. 1155, 14 South. 141, the court sought to dissuade and warn district attorneys from going too far in presenting the cause of the state. After this statement had been made, the court did not arrive at the conclusion that the district attorney (although' he had used words that he should not have used) had by his remarks rendered the proceedings illegal. The prosecuting officer is not the adviser of the jury. He is only an advocate representing the cause of the state, and his words should be given weight only when they are reasonable and seek to maintain a just cause of the state; but, when he departs from that line of duty, the presumption is that the court and the jury are able to judge of the correctness of his position.
In this instance, as well as in others in which the prosecuting officer has been criticised by learned counsel for the defense, the *833 presumption above stated has not been overcome.
Before concluding on this point, we will state that the decision in State v. Meche, 114 La. 231, 38 South. 152, is quite pertinent. The court said, among other things upon the subject, that the statement of the judge negatived all thought ^at the remarks of the district attorney were prejudicial and sustained the court’s action.
In the present case the facts are somewhat similar, not entirely so. The statement is far from being as extreme as in the cited case.
We conclude that there was no good ground for the complaint urged.
[19] 16. Defendant’s counsel narrated the facts and followed in this narration the young men, parties to the tragedy, from the last saloon in which they drank to the Deaf and Dumb Institute. They stated the facts of the tragedy so far as known; they related incidents of friendship between the deceased and the defendant; they recounted impartially the serious trouble the principals had had some time previous but expressly stated that this trouble had been quickly forgotten and that they were warm friends again; they referred to the statements of a witness (not considered reliable) conveying the idea that the defendant had not forgotten the trouble; they evidently did not believe the statement. This lengthy statement was made in order to lead up to a special charge requested but refused by the district judge, we think properly. The purpose of the special charge requested was to have the jury instructed that if defendant and deceased were struggling for the pistol, and while thus struggling the pistol went off, and that without intent deceased was shot, it was the duty of the jury to acquit the defendant. It was not a logical theory based upon evidence, we take it. The contention was that the defendant jumped out of bed while asleep, grabbed the pistol while in a trance, became engaged in a scuffle with the deceased during which the pistol was fired. We are informed by the statement of the trial judge that the jury was fully instructed by him on the subject of unintentional homicide. The judge added that the charge requested was misleading and unsound. It was taken as unsound and misleading because not in accordance with the theory of the case and not sustained by the facts. He had heard the whole evidence, and in a case of this gravity he doubtless had the facts in hand. He solemnly asserts that the facts were not applicable.
In the following cases the court gave effect to the thought that it is proper for the trial judge not to instruct the jury in regard to a theory which the facts do not at all sustain: State v. Anderson, 120 La. 331, 45 South. 267; State v. Pellerin, 118 La. 547, 43 South. 159.
17. The defendant again makes reasonable doubt another point of his defense and complains that the jury was not sufficiently instructed upon the subject. He says, that which is very true, that the onus of proof was with the state; that, if there was a reasonable doubt in regard to the evidence necessary to convict him, defendant should have the benefit of that doubt; that the presumption of the innocence of an accused should be taken into consideration. The defendant urged that the jury should have been given the charge requested because he depended particularly upon circumstantial evidence; that there was no witness present when the homicide was committed.
The court refused to give that instruction.
We read the charge and arrived at the conclusion that it is sufficiently explicit on the subject and that defendant has no good ground of complaint.
[20] 18. Defendant further urged that the court should have charged as requested that, if the theory that the fatal shot was fired *835 by the deceased was sustained by the evidence, defendant was entitled to an acquittal. This suggests the idea that the accidental shot in the struggle came from the deceased. The trial court thought that this position of the defense was an assumption without the least foundation; that it was inconsistent with the instructions he sought to have given. ' If the court is correct in the statement that the instruction was based on a mere assumption, it was correct not to give a charge entirely at variance with the testimony of witnesses who testified positively as to the statement made by defendant to them. This negatives the idea that the deceased held the pistol when the fatal shot was fired.
19. Defendant presented his defense from every angle. His present contention is that the court erred in refusing to comply with his request to specially instruct the jury that if they believed from the evidence that another might have fired the fatal shot again the defendant should be acquitted.
[21] Leaving the point just decided, we will here state that the defense again referred to the testimony of the mother of the accused regarding her son when he was in a somnambulistic condition. They averred that which is doubtless true, that she had observed her son closely from childhood, studied his movements, and that she naturally could tell that the defendant was not in a normal condition on the night of the tragedy, and that for reasons stated she was as competent as an expert.
The idea is not conveyed, even by the defense, that the evidence of the mother in regard to the trance-like condition of her son on the night of the tragedy was not heard. On the contrary, the trial judge states that all of her evidence on the subject was heard by the jury. This was all that the defendant could expect; it left him without the least ground of complaint. What more could he ask? His mother was permitted to state all that she knew upon the subject. Her evidence was heard by the jury, who were competent under the law to pass upon the questions raised.
[22] 20. In the next place the defendant complains of the court’s ruling denying his right to a special charge, as requested, regarding insanity. The court did instruct the jury regarding insanity and the irresponsibility which arises when a person commits an act while insane, at a time when he was not in a mental condition to commit a crime. The instruction sufficed. We have read the whole charge; it is sufficiently full upon the subject of insanity and irresponsibility on its account. The same is true in regard to the right of self-defense, which the defendant wanted the court to elaborate further upon as an instruction to the jury; Self-defense was not the plea; none the less the court gave the jury instructions upon the subject of self-defense.
[23, 24] 21. The defendant sought to sustain his motion for a new trial by examining a number of witnesses who stated that jurors had talked to persons outside of the jury room, even outside of the courthouse, is one of the grounds of complaint. One of the witnesses said that he had had his dinner and that that was more than the jurymen inside could say, to which the juryman made a commonplace reply. There is no reversible error in the foregoing, a harmless utterance between an acquaintance and the juryman. While even that should be avoided if possible, it is not subject to the objection to the extent claimed; it will not be presumed that the jury’s attention was prejudicially attracted by what was going on outside. The evidence upon the subject should be reasonably certain. Complaint is again urged to the improper utterance of a person outside who used highly unbecoming language. It is now insisted that the epithets and the words accompanying them were heard by all the *837 members of the jury. They swore that they had not heard the words. It is also in evidence that if they were heard by the jury it was after the verdict was found. Generally no attention will be paid to evidence regarding utterances outside, if they were uttered after the jury had deliberated and come to a conclusion. But here the objection more particularly is that the jurors were examined to prove that they had not heard these utterances on the outside, particularly the one last mentioned. The contention was that, the jurors having been examined in chief, defendant had a right to cross-examine them. This was met with the proposition on the part of the state that the purpose was to attack and set aside the verdict; that it is well settled that a jury’s verdict cannot be impeached and annulled on the evidence of the jurors themselves. That being the well-established jurisprudence, it must be held as controlling, for the only result would have been to set aside the verdict of the jurors, had they been heard. On that ground we think that the ruling was correct. Besides, the attempt involved raising new issues on the part of the defendant in regard to the merits of the ease, which could not be raised at that particular time and in that particular way. Moreover,- it has been decided that juries can be heard to confirm the correctness of their verdicts but not to set them aside. Jurymen can only be heard to rebut the allegation of their own misconduct. The purpose may not have been to directly impeach a juror’s verdict but his veracity. This it was impossible to do without attacking the verdict. One cannot do indirectly that which cannot be done directly. There are decisions in which it has been held that even in extreme cases the jury will be heard, as in the case of bribery or a shameful assault and battery upon the jury and thereby intolerable intimidation. That question was merely touched upon in the case of State v. Riggs, 110 La. 510, 34 South. 655. There are other decisions. It certainly has never been extended to such an extent as here claimed. Here it was proposed to ask the jury if they were influenced in rendering their verdict by anything other than the law and the evidence, if they had heard a particular witness and what he had said, and other similar questions. Really the whole should have been excluded; the evidence taken in chief and on cross-examination. The fact that part of the evidence, which was meaningless, amounted to nothing, was heard did not authorize the reopening of issues settled by the verdict in so far as the jurors were concerned.
[25-27] 22. On the application for a new trial a number of questions were presented by the defendant and are now pressed upon the attention of this court. These questions were decided in the district court against the defendant. The first is that the verdict was contrary to law and the evidence. That objection is not of the least importance here, as settled by a long list of decisions. Again it was urged that the rooms of deliberation of the jury were opened and the jury exposed to view and their attention distracted by persons passing very near. There is no proof of improper influence. The allegations are not sustained to enable us to seize upon any particular fact showing damaging interference. Following is the statement of the trial judge before us in due form-, to wit: That the jury was in charge of a competent officer and that it was assigned to the apartment used as a deliberation room; that the circumstances were usual and the jury above reproach; it was a representative body; there was no severance at any time or stepping aside with any outsider; that these jurors did not hear the remarks made in court and could not be prejudiced by them; that, as to the irregularities charged, they *839 are not serious; it is not every irregularity that will vitiate a verdict. The judge cites State v. Garig, 43 La. Ann. 365, 8 South. 934, as authority.
The foregoing is certainly pointed, and the evidence does not overcome the statement made by the judge under well-settled jurisprudence.
23. Another ground for a new trial:
One of the jurors was called upon to relate to two of the counsel for defendant the conversation that he had had with them and what he had said as to the effect it would have had on the jury if defendant had gone on the witness stand in his own behalf and what he said as to the probable acquittal in that case, and if he had not been asked what the district attorney had said with reference to his not going on the stand, and the answer.
On objection of the district attorney, the court ruled out the evidence sought, as just before stated. Counsel for defendant excepted at some length to the ruling of the court. Their contention was that the purpose was to show hostile feeling created by the remarks of the district attorney in regard to the failure of the defendant to testify in his own behalf; that this failure had been discussed while the jury was deliberating upon defendant’s ease.
It has never been decided by this court that it was possible to impeach a verdict in the manner proposed by the defendant; that is, by proving by the jurors themselves anything connected with the discussion or anything considered thereafter to the end of having the verdict declared a nullity.
24. We return, as we said we would, in deciding the first point, to the question of the impeachment of the testimony of one’s witness. We passed upon the point, in part only, only to the extent that the judge of the district court declared that the evidence was admissible for the purpose of proving the facts and any possible error of the witness, but no further. We heretofore decided that the examining counsel may seek to have contradictions explained but not beyond that point. The question which we postponed and which we deemed advisable to take up separately was the right of impeachment vel non of the witness; the contention of the district attorney in support of his position that the witness’ testimony might be impeached was that he was taken by surprise. This is doubtless true up to the time that the judge’ ruled upon the admissibility of the evidence which he offered to sustain his right as prosecuting officer to introduce, evidence impeaching the testimony.
[28, 29] With a view of an intelligent decision, we refer to the address of the district attorney, made to the jury, in which he stated, as per counsel’s for defendant statement in the bill of exceptions, based on the note of the stenographer, that the witness Mrs. S. M. Robertson stated to the jury in the second trial that at no time had she answered “No” to a question propounded by the district attorney. Counsel for defendant objected at the time to the alleged misquotation of Mrs. Robertson’s testimony by the district attorney in his address to the jury; the court took no action; and the district attorney made no disclaimer.
The complaint at this point is that the language of the district attorney is an impeachment by him of the state’s own witness, Mrs. S. M. Robertson, and the assertion of the district attorney that he had heard Mrs. Robertson answer “No” to each of the questions. The effect of the legal inference intended to be given to the jury on these particular questions was that the witness had changed her testimony.
To state it differently: The district attorney’s contention was that Mrs. S. M. Robertson had not testified on the first trial as *841 she had on the second; that on the second trial she testified ahont a fall on the floor, about a whisky bottle, and about high-heeled slippers tripping on the floor just above her room; that he had heard her answer on the second trial that she had not thus testified on the first trial.
She insisted that «he had testified to the same facts on the first trial but that the stenographer’s copy was not complete.
Continuing with his address, the district attorney said:
“Now, gentlemen, simply because Maxi Miller forgot to tell something as a witness it is awful in poor Maxi.” (Italics ours.)
Maxi was one of the state’s witnesses, whom it appears the defense had severely criticised, which criticism the district attorney noticed as above stated.
In stating objections forming part of the bill, counsel for defendant added that a copy of every question propounded to Mrs. Robertson, the mother of defendant, together with her answers, was annexed to the bill of exceptions, and that it nowhere appears, and at no time was it made to appear, that these questions, in regard to which the district attorney was commenting as above stated, were propounded to the witness on the second trial.
Our brother of the district court stated on this point, and the statement is made part of the bill of exceptions, that the bill presented a mere contention between counsel for defendant and the district attorney “as to the proof or manner of proof of certain facts in the ease.” That the court had attentively followed the testimony and did not consider that the district attorney had gone out of the record or had misquoted the substance of the testimony, and for these reasons the court is of the opinion that the district attorney did not transgress the scope of legitimate argument.
If it is as stated on the face of the papers, the witness Mrs. Robertson did not testify that she had stated differently on the first trial', nor on the face of the papers (the stenographer’s notes) does it appear that she testified on the first trial about slippers, a bottle of whisky, and a heavy thud, as from some one falling on the floor. We take it that it is, as Mrs. Robertson states, her testimony was not completely reported by the stenographer.
The effect of this will not have to be considered.
In the'first place, in order to decide that the district attorney’s intention was to impeach the testimony of the witness, it would be necessary to hold that he had sought to avoid the court’s ruling before stated, which was that the evidence could only be offered to prove that Mrs. Robertson was in error, but that she could not be impeached as she was the state’s witness.
The judge who had followed the evidence closely, as he stated, is positive that there was no attempt made to impeach the witness. He had heard all the testimony.
When the judge and counsel for an accused differ as to what the prosecution said in argument, “evidence on that subject should be taken, else the statement of the trial judge must be accepted.”
The trial judge has large discretion in permitting an argument when objection is raised. It will not be presumed or inferred that he failed to stop improper utterances. State v. Young, 114 La. 686, 38 South. 517.
“Besides requesting the judge to stop counsel, defendant should request that the jury be charged to disregard the words complained of.” Id.
We have noted that the accused, through counsel, objected to the district attorney’s utterances and urged that the district judge gave the objection no notice. When the judge states in substance that the testimony had-not been misquoted nor the witness impeach *843 ed, the court’s statement is taken to have weight. It was not shown with reasonable certainty that the court’s statement was erroneous. We are not sufficiently informed to enable us with reasonable certainty to hold that the district judge erred in his ruling and in his statement of the facts.
The reference of the district attorney to the witness was not as one who stood before the court as an impeached witness; on the contrary, he referred to her as one who had forgotten to make the statement which she afterward made on the second trial. There is no assertion in this that she sought to conceal facts and that she had thereby become an unreliable and unworthy witness. It must be remembered always that the judge’s ruling was that she was not impeached.
The defendant’s counsel cited with confidence State v. Vickers, 47 La. Ann. 1574, 18 South. 039. There is a great difference between the present and the cited case.
In the latter (the 47 La. Ann. case) this court said:
“The record shows that the trial judge permitted the question to be answered for the sole purpose of discrediting the witness.” (Italics ours.)
In the present case the court’s ruling was, and it must have gone to the jury, that the witness could not be impeached, although a different state of facts might be shown on a particular point.
In the cited case the court held inter alia:
“The exception is that he is sometimes permitted, in case of hardship, when the' testimony of the witness is unexpectedly unfavorable, to contradict him by other evidence to the issue in the case” — citing 1 Starkie on Ev. 147; 1 Greenleaf, Ev. pars. 442, 443 ; 3 Rice on Evidence, p.‘373; State v. Simon, 37 La. Ann. 569.
“And where a party is bona fide surprised by his witness he may be permitted to interrogate as to previous declarations made by him inconsistent with his testimony, the object being to. prove the witness’ recollection and to lead him, if mistaken, to revise what he said” — citing decisions.
This, we are informed was what was held by the district judge in the present case.
The other decisions are not more controlling. They relate to "the attempt made to impeach one’s own witness. Here the point is that the district attorney misquoted testimony. The judge said he did not. The trial judge had heard all the testimony and solemnly asserted as stated.
Another point is earnestly presented in the brief: It is that impeaching questions were permitted without first having placed the witness on her guard of the intention of the prosecuting officer. The objection from the view of counsel for the defense would be correct if the intention was to impeach the witness, but, under the ruling of the district judge, the intention expressed was modified and the district attorney was directed to limit his examination to ascertaining the facts of the case and was instructed that the impeachment of his witness was not permissible.
We have gone over the bulky record and have reviewed the many points forcibly presented. We leave the case vs^ith the conviction that, whatever there may be to be considered, it does not fall within the province of this court. There were irregularities during the trial beyond question, but they were met by evidence that, despite these irregularities, the jury was not influenced in any way. There remains only one alternative.
For reasons stated, it is ordered, adjudged, and decreed that the verdict and sentence are affirmed. ,